561 A.2d 219

**BOARD OF CHILD CARE OF the BALTIMORE ANNUAL CONFERENCE OF THE METHODIST CHURCH, INC. et al.**

v.

Hubert H. HARKER et al.

No. 120, Sept. Term, 1988.

Court of Appeals of Maryland.

July 28, 1989.

684

Marvin I. Singer (F. Duncan Cornell, Hooper, Kiefer & Cornell, Baltimore, for The Bd. of Child Care of the Baltimore Annual Conference of the Methodist Church, Inc.; Arnold Jablon, County Atty., Nancy C. West, Asst. County Atty., Towson, for Baltimore County), all on brief, Carolyn A. Quattrock, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore for State of Md. as amicus curiae), on brief for petitioners.

Peter Max Zimmerman, Deputy People's Counsel, Phyllis Cole Friedman, People's Counsel, Baltimore County, on brief, Arnold Fleischmann, Towson, for respondents.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

The question presented is whether a State-licensed and regulated child care facility, to be operated by a nonprofit charitable corporation on property owned by it, is subject to county zoning regulations.

## I.

The Board of Child Care of the Baltimore Annual Conference of the Methodist Church, Inc. (the Methodist Board) was established, according to its charter, "to aid, protect, care for the needs and welfare of orphaned, indigent, neglected and dependent children." It currently operates two adolescent shelter facilities in Baltimore County. The first was established in 1960, and provides residential care for sixty homeless children. The second was built in 1982 and provides emergency short-term shelter for seventeen children.

Subsequently, on December 5, 1985, the Methodist Board purchased a 14.77 acre tract of land on Liberty Road in Baltimore County with the intention of constructing a third child care facility, to be composed of five residential buildings, each with the capacity to house twelve children. This facility was proposed to house non-delinquent children between the ages of two and seventeen who were victims of serious physical, sexual and emotional abuse. The site selected by the Methodist Board for this facility was within the Resource Conservation zone established by the Baltimore County Zoning Regulations (BCZR). Specifically, the property was zoned, in part, as R.C. 2 (agricultural use) and as R.C. 5 (rural-residential use). Under the BCZR, child

care facilities are categorized as "community care centers." § 101. They are permitted in an R.C. 2 zone only by special exception, provided that "the use would not be detrimental to the primary agricultural uses in its vicinity," and the facility not "provide care for more than 15 persons per site." BCZR § 1A01.2(C)(5). The R.C. 5 zone contains a similar density restriction. § 1A04.2(B)(5A). Thus, the larger sixty person facility proposed by the Methodist Board would not be permitted at all in either an R.C. 2 or R.C. 5 zone.

The Methodist Board purchased the Liberty Road site, believing it was entitled to an exemption from county zoning regulations because one of its earlier child care facilities had been afforded an exemption based upon a 1982 opinion of the then County Attorney of Baltimore County. That opinion, which the Zoning Commissioner accepted at that time as pronouncing the governing law, expressed the view that a child care facility performs a governmental function and was therefore exempt from county zoning regulations.

A special hearing before the Zoning Commissioner pursuant to § 500.7 of the BCZR was held to determine whether the proposed new Liberty Road facility was entitled to an exemption. The Methodist Board maintained that the exemption was appropriate because, in providing a child care facility, it was acting as an agent of the State performing a governmental function. A number of adjoining property owners opposed the exemption claiming, *inter alia,* that the proposed use of the property did not make the use "a governmental function or entitle it to an exemption from the effect of the zoning law."

The Zoning Commissioner, after a hearing, noted that the Methodist Board was licensed by the Social Services Administration of the Maryland Department of Human Resources and was governed by the Code of Maryland Administrative Regulations, 07.02.13 (COMAR). He recognized that the proposed facility would provide short-term emergency care for non-delinquent children, who were homeless, dependent,

neglected or who had been abused. Referrals would come from various county Departments of Social Services. The Methodist Board, the Commissioner found, "provides a facility that serves a definite public policy, satisfying our society's overriding concern for the benefit and welfare of children." The Commissioner opined that the General Assembly "has mandated that government assume the responsibility to ensure that our children be provided a safe and stable facility where they can be protected during times of crises"; consequently, he said, "the State has overriding interests that subjugate local concerns," as a result of which the statutory provisions for child care facilities constitute "a legislatively imposed obligation." The Commissioner concluded that it was the general policy of the State, as manifested by statute, to promote child care facilities; that being governmental in nature, these facilities were not subject to local zoning restrictions; and that such a facility constituted a "public use," which extended beyond direct State ownership and control of property. According to the Commissioner, "the extrapolation from publicly-owned property to privately-owned property does not change the result as long as the ultimate use and purpose to which the property will be used is unquestionably a public one." The determinative factor, the Commissioner summarized, is "the character of the proposed use"—if it is a "public one or confers a public benefit ... [,] local zoning regulations are inapplicable."

The protesting property owners, together with People's Counsel of Baltimore County, appealed to the County Board of Appeals (the County Board).[1] Following a hearing, the County Board vacated the Zoning Commissioner's order. It identified the question presented as whether "the State's immunity from local zoning regulations attaches to a privately-owned property being used for public purposes."

---

1. The Baltimore County Charter, § 524.1(b) (1978) provides in part that the People's Counsel shall have the power and duty "to defend the comprehensive zoning maps as adopted by the county council, in which he may deem the public interest to be involved."

The County Board, after recognizing the "urgent need" for child care facilities, noted that all referrals to the facility "would be made pursuant to a contractual arrangement entered into by and between the property owner and the State of Maryland." Nevertheless, it said that the County intended that its zoning regulations apply to these facilities; that the facility was not exempt because it exercised "a governmental function" and this was so notwithstanding the fact that child care facilities exist for the public good and must be licensed by the State.

The Methodist Board appealed to the Circuit Court for Baltimore County. At this juncture, Baltimore County was permitted to intervene. Its position echoed that of the Methodist Board, namely, that the county zoning regulations did not apply because the facility was performing a governmental function and was therefore exempt from zoning restrictions in the BCZR. The court (Nickerson, J.) affirmed the County Board, holding that no exemption existed "from local zoning for privately owned land used by private organizations for functions governmental in nature."

The Methodist Board appealed to the Court of Special Appeals. Prior to consideration by the intermediate appellate court, we granted certiorari to consider the significant issue of public importance raised in the case. We also granted permission to the State of Maryland to file a brief Amicus Curiae in the case in support of the position taken by both the Methodist Board and by Baltimore County.

## II.

Title 5 of the Family Law Article of the Maryland Code (1984, 1988 Cum.Supp.), entitled "Children," contains eleven subtitles covering §§ 5-101 through 5-1104. Subtitle 5 is captioned "Child Care; Foster Care"; it encompasses §§ 5-501 through 5-589.

Section 5-502(b) of subtitle 5 declares it to be the policy of this State "to protect minor children whose care has been relinquished to others ... [and] to encourage the develop-

ment of day care services for minor children in a safe, healthy, and homelike environment." Section 5-506(a)(1) recognizes that the care of these children is a State responsibility. With exceptions not here pertinent, a license from the Social Services Administration of the Department of Human Resources (the Administration) is required to operate a child care home or institution before exercising "care, custody, or control of a minor child." §§ 5-508 and 5-509. The Administration is authorized by § 5-506 to adopt rules and regulations to carry out the purpose of these sections.[2]

In connection with its licensing function, the Administration is authorized by § 5-519 to "investigate the policies, purposes, premises, and facilities of a licensee or an applicant for a license." Section 5-525 directs the Administration to establish a program of short term and permanent foster care for minor children in approved child care facilities and in connection therewith to adopt rules and regulations. Section 5-526(a) requires the Administration to provide "for the care, diagnosis, training, education, and rehabilitation of children by placing them in ... institutions that are operated by nonprofit charitable corporations." Section 5-526(b) directs the Administration to reimburse these corporations "for the cost of these services at appropriate monthly rates." Section 5-532 authorizes the Administration "to adopt rules and regulations to carry out the child welfare services and foster care programs under this subtitle."

Maryland Code (1985 Repl.Vol., 1988 Cum.Supp.), Article 88A, entitled "Social Services Administration," empowers the Administration to supervise "all public and private institutions having the care, custody or control of dependent, abandoned or neglected children, except those institutions under the authority of the State Juvenile Services Administration." § 3(c). The Administration has also been

---

**2.** Subtitle 7 of the Family Law Article, entitled "Neglected Children," sets forth in § 5-702 the policy of the State to protect neglected children; it requires that "appropriate service [be provided throughout the State] in the best interests of the neglected child."

authorized "to designate existing agencies or organizations within the State as its agents as may in its discretion be desirable or necessary for the purpose of this article." § 3(f). The Administration does not itself operate any child care facilities.

The Administration's regulations of child care facilities are contained in Volume III, Title 7 of COMAR (Human Resources). Subtitle 2 of this Title, captioned "License for Care of Children" comprehensively prescribes health and safety requirements for child care facilities, both in respect to the services provided to the children and to the physical facilities housing them. They also delineate standards of financial accountability, record keeping and provisions for reimbursement of services to the State. COMAR, Section 07.02.13, 07, under the caption "General Requirements for all Child Care Facilities" provides:

"(1) Zoning Approval. The facility shall comply with any applicable zoning regulations and obtain approval when this is required by the local zoning authority."

Section 5–506(d)(1) of the Family Law Article provides that a child care home or institution "may not be required to obtain a license from more than 1 State agency." [3]

III.

The rule in Maryland is that the State is not bound "by an enactment of the General Assembly unless the enactment

---

3. Code (1988 Repl.Vol.), Art. 83C, § 2–117, authorizes the Juvenile Services Agency (JSA) (now a Department) "to operate facilities necessary to diagnose, care for, train, educate and rehabilitate" children within its jurisdiction who are in need of these services. Sections 2–114 and 2–120 authorize JSA to place these children in institutions operated by nonprofit corporations, to designate these corporations as its agent for the purpose of buying services, and to reimburse them for the cost of services provided. Sections 2–123 and 2–124 require JSA to license child care facilities except, *inter alia*, where such a facility has previously been licensed by the Administration under § 5–506 of the Family Law Article.

COMAR, § 14.22.03.16 requires that before a child care facility can be licensed by JSA, it must comply with "local zoning requirements as to physical plant."

specifically names the State or manifests a clear and indisputable intention that the State is to be bound." *City of Baltimore v. State*, 281 Md. 217, 223, 378 A.2d 1326 (1977). *See also People's Counsel for Baltimore County v. Maryland Marine Manufacturing Co., Inc.*, 316 Md. 491, 560 A.2d 32 (1989) (No. 89, September Term, 1988, filed July 6, 1989); *City of Baltimore v. State Dep't*, 38 Md.App. 570, 571, 381 A.2d 1188 (1978). We held in *City of Baltimore, supra*, 281 Md. at 223, 378 A.2d 1326, that the State was exempt from the city's zoning regulations because nothing in its zoning enabling law, either expressly or by clear implication, subjected the State to the provisions of that jurisdiction's zoning ordinance.

Maryland Code (1987 Repl.Vol.), Article 25A, § 5(X), which grants Baltimore County its zoning authority, neither specifically provides nor clearly implies that the State is intended to be subject to its provisions. That statute (a part of the Express Powers Act governing home rule counties) provides in subsection (X)(2)(i) that it is "the policy of this State that the orderly development and use of land and structures requires comprehensive regulation through implementation of planning and zoning controls"; and subsection (ii) thereof specifies that "zoning controls shall be implemented by local government." Section 5(X)(2)(v)(4) provides that the county's zoning powers shall not "preempt or supersede the regulatory authority of any State department or agency under any public general law."

The Methodist Board argues before us that the State's exemption from Baltimore County's zoning regulations extends to property owned by a nonprofit charitable corporation which that corporation uses pursuant to a contract with the State to provide governmental services mandated by State law. It says that the statutory authority of the Administration to designate private corporations as agents of the State to carry out clearly defined public policy is necessarily accompanied by exemption from local zoning regulations. According to the Methodist Board, title to the property is not the determinative factor for exemption

purposes; rather, it is the nature of the use to which the property is put by its owner.

The Methodist Board points to the provisions of the Family Law Article which require the State to place homeless children in licensed child care facilities operated by nonprofit charitable corporations. It also focuses on those provisions of Article 88A authorizing the State to designate nonprofit charitable corporations as its agent to provide child care services required by statute. Applying fundamental principles of agency law, the Methodist Board claims that, as the State's statutory agent, it succeeds to the exemption held by its principal while performing the governmental function required by law.

The Methodist Board augments its basic argument by contending that the State has impliedly preempted the field of licensing and regulation of child care facilities, and thus Baltimore County is precluded from exercising any control over these facilities by means of local zoning regulations. State legislation, the Methodist Board contends, is so comprehensive as to evidence a clear intention by the legislature to occupy this entire field and, as a consequence, the State has reserved to itself exclusive dominion over determinations governing whether, or where, child care facilities may be established and operated. The State of Maryland, in its *amicus* brief, fully supports the Methodist Board's preemption argument.

The protesting property owners and People's Counsel maintain that the Methodist Board is not a constituent part of the State government and is not, therefore, an agency or instrumentality of the State in any traditional sense; rather, they say, the Methodist Board is simply a vendor of services required to be provided by the State, for which the State makes payments under a contract authorized by statute. Nothing in the law, they say, requires the Methodist Board, or any other nonprofit charitable corporation, to undertake these activities. Moreover, it is argued, the State's immunity from local zoning controls emanates from

its sovereign nature rather than from the type of activity to be conducted on the property.

As to implied preemption, the protesting property owners and People's Counsel claim that the State statutes in question, while regulating child care facilities through the licensing process, do not encompass the location of these facilities. They point out that these statutes are silent on the applicability of local zoning criteria to licensed child care institutions and that preemption cannot be implied by mere silence.

## IV.

■ That the exemption from county zoning regulations accorded to the State under our holding in *City of Baltimore v. State, supra,* extends to the State's agencies and instrumentalities is entirely manifest. Plainly, the Methodist Board is not a unit of State government. It was not created by legislative enactment and the State exercises no control over it beyond licensing its child care facilities and prescribing various operating standards. The relationship of the Methodist Board to the State is defined by the provisions of the "child care" contract between them and the licensing regulations and requirements. That child care institutions licensed under Subtitle 5 of the Family Law Article are identified as "agents" of the State by § 3(f) of Article 88A in no sense was intended by the legislature to invest them with any part of the State's sovereign power to act as an instrumentality of the State government.

■ Contrary to the Methodist Board's argument, it is not the law of Maryland that a nonprofit corporation which voluntarily contracts to perform a governmental service required by State law on property which it owns is entitled to the State's immunity from municipal zoning ordinances. As the Supreme Court of Georgia held in *Macon Ass'n for Retarded Cit. v. Macon–Bibb,* 252 Ga. 484, 314 S.E.2d 218, 223 (1984), "property owned by a nonprofit corporation [and licensed to operate a home for retarded citizens] is not

immune from local zoning regulations, even if the corporation is performing services which are governmental in nature, at least in the absence of a clear expression of intent by the legislature that such immunity be extended." Similarly, the Supreme Judicial Court of Maine in *Penobscot Area, etc. v. City of Brewer,* 434 A.2d 14, 19 (Maine 1981), also involving a nonprofit corporation organized to provide housing for retarded citizens pursuant to state law, found no merit in the argument that the corporation was entitled to the State's exemption from local zoning ordinances because it "was acting as an agent of the state in furtherance of clearly articulated state obligations and interests." After noting that nonprofit corporations frequently promote state interests, and often are beneficiaries of financial programs offered by state agencies, the court concluded that the corporation was subject to municipal zoning regulations.

*Outerbridge Terminal v. Perth Amboy,* 179 N.J.Super. 400, 432 A.2d 141 (1980) involved a private organization which claimed an exemption from local zoning regulations because of its contractual relationship to provide governmental services to the federal government. At 179 N.J.Super. 400, 432 A.2d at 143, the court held that "[z]oning regulations are directed to the land itself, and in determining whether the important local interests which are reflected in the zoning scheme ought to be avoided by immunity, the pivotal question is the nature of the government's interest *in the property* and not the nature of the government's interest in the subject matter of the contract." (Emphasis in the original.) To the same effect, *see Tp. Township of Wash. v. Cent. Bergen Com. M.H. Ctr.,* 156 N.J.Super. 388, 383 A.2d 1194 (1978) (the doctrine of immunity from local zoning regulations by a nonprofit corporation cannot be invoked because it is not a governmental agency); *Carroll v. Board of Adjustment of Jersey City,* 15 N.J.Super. 363, 83 A.2d 448 (1951); 2 Anderson, *American Law of Zoning,* § 9.06 (1968); Comment, *Governmental Immunity from Local Zoning Ordinances,* 84 Harv.L. Rev. 869 (1971).

These authorities make clear that the right to exemption does not turn on the use being made of the property by the party claiming exemption but upon its ownership by the state or its instrumentalities. Were it otherwise, all entities licensed by the state, and providing governmental services, would be entitled to exemption from local land use regulations—a sweeping application of the state exemption doctrine which would undoubtedly undermine the important objectives of municipal zoning.

In concluding that the Methodist Board is not entitled to invoke the State's immunity from Baltimore County zoning regulation, we have considered those cases relied upon by the Methodist Board in support of its view of the governing law. *Wiltwyck School for Boys, Inc. v. Hill,* 11 N.Y.2d 182, 227 N.Y.S.2d 655, 182 N.E.2d 268 (1962) held that a charitable corporation which operated an institution for the education of mentally retarded persons constituted a "school" and was therefore a permitted use in the municipal zone in which it sought to construct a building. The case does not stand for the principle espoused by the Methodist Board, *i.e.,* that the State's exemption from local zoning regulations extends to a private noncharitable corporation performing a vital governmental function. Equally inapposite is *Rutgers, State University v. Piluso,* 60 N.J. 142, 286 A.2d 697 (1972). The issue in that case was whether municipal zoning ordinances were applicable to a state agency. The court there adopted the so-called "balancing of interests" test in determining whether the legislature intended to subject a state agency to local zoning regulations. Similarly, *Blackstone Park, etc. v. State Bd., etc.,* 448 A.2d 1233 (R.I.1982) offers no support to the Methodist Board's position; that case involved an intergovernmental zoning dispute in which the court applied the balancing of interests test in determining whether local municipal zoning regulations applied to a governmental agency.

Several cases do lend support to the Methodist Board's position that a nonprofit corporation providing a governmental service pursuant to a contract with a state agency is

entitled to the state's zoning immunity. *See* the New Hampshire cases of *Northern N.H. Mental Health v. Town of Conway,* 121 N.H. 811, 435 A.2d 136 (1981); *Region 10, etc. v. Town of Hampstead,* 120 N.H. 885, 424 A.2d 207 (1980); *Portsmouth v. John Clark & Sons, Inc.,* 117 N.H. 797, 378 A.2d 1383 (1977). *City of Temple Terrace v. Hillsborough Ass'n, etc.,* 322 So.2d 571 (Fla.App.1975), *aff'd,* 332 So.2d 610 (Fla.1976) is also supportive of the Methodist Board's argument. Some of these cases appear to turn on an application of the implied preemption doctrine, rather than on the proposition that a private corporation performing a governmental service can avail itself of the state's exemption from local zoning regulations. We are, in the circumstances, not persuaded by the rationale of these decisions and decline the Methodist Board's invitation to adopt the principle there adopted.

## V.

■ The Methodist Board and the State as *amicus curiae* advance the related argument that the General Assembly has preempted the field of licensing and regulation of child care facilities, thereby precluding any control over these institutions by means of local zoning restrictions. Moreover, they contend that the BCZR conflicts with State public general law and therefore is void as to its zoning regulation of child care facilities. As to this, they say that any proscriptions of child care facilities in R.C. 2 and R.C. 5 zones jeopardize the State's ability to meet its statutory responsibility to care for and protect dependent and neglected children. Thus, the Methodist Board argues that the State's effort to license a child care facility at a particular location where a compelling need exists cannot be thwarted by local zoning restrictions.

■ That the legislature has power to reserve for itself exclusive dominion over an entire field of legislative concern is clear. *Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 324, 513 A.2d 893 (1986). The primary indicia of a legisla-

tive purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field. *Id.* at 328, 513 A.2d 893. In *McCarthy v. Bd. of Education of A.A. Co.*, 280 Md. 634, 639, 374 A.2d 1135 (1977), we recognized three grounds upon which otherwise valid local legislation might be invalidated because of State legislation concerning the same matter, *i.e.*,

"(1) ordinances which conflict with public general law, (2) ordinances which deal with matters which are part of an entire subject matter on which the General Assembly has expressly reserved unto itself the right to legislate, and (3) ordinances which deal with an area in which the General Assembly has acted with such force that an intent to occupy the entire field must be implied."

In other words, preemption may be accomplished either expressly by statutory language prohibiting local legislation, *e.g.*, *Montgomery County v. Atlantic Guns, Inc.*, 302 Md. 540, 489 A.2d 1114 (1985), or impliedly by other unequivocal conduct of the General Assembly, *County Council v. Montgomery Ass'n*, 274 Md. 52, 325 A.2d 112 (1974). In either case, the focus of the inquiry must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field. *Ad + Soil, supra*, 307 Md. at 324, 513 A.2d 893 and authorities there cited.[4]

That there has been no express preemption by the legislature of the entire field of regulation of child care facilities under Code, Article 88A and Subtitle 5 of the Family Law Article is altogether plain. As to implied preemption or "preemption by occupation," *see National Asphalt, supra*, 292 Md. at 78, 437 A.2d 651, the precise issue is whether, in light of State statutory provisions, Baltimore County zoning regulations governing the location of these facilities are

---

4. Our cases involving implied preemption of county laws in light of comprehensive State legislation in the fields include *National Asphalt v. Pr. Geo's Co.*, 292 Md. 75, 437 A.2d 651 (1981), and *Mont. Co. Bd. of Realtors v. Mont. Co.*, 287 Md. 101, 411 A.2d 97 (1980).

valid. In this regard, we recognized in *Ad + Soil, supra,* 307 Md. at 334, 513 A.2d 893, that under Article 25A, § 5(X) of the Code, one of the cornerstones of Maryland's system of land use in home rule counties is that zoning controls be implemented by local government. Specifically, we there said that "[i]n view of such a clearly established legislative policy, evidence of a countervailing legislative purpose to prohibit local zoning control . . . must be strong indeed." *Id.* at 334, 513 A.2d 893. In *Ad + Soil,* we found no implied preemption of local zoning ordinances governing the location of sewage sludge facilities, despite the existence of pervasive statewide legislation requiring permits for sewage sludge facilities and extensively governing the storage and distribution of sewage sludge.

We conclude that there is no comprehensive regulatory scheme governing child care facilities under the public general laws of the State legally sufficient to imply a legislative purpose to totally occupy the field, and thereby preclude all local zoning regulations pertaining to the location of these facilities. Nothing in the statewide statutes mentions preexisting local zoning ordinances, a clear indication that the General Assembly did not intend to preempt these local laws. *See Ad + Soil, supra,* 307 Md. at 333, 513 A.2d 893; *National Asphalt, supra,* 292 Md. at 79, 437 A.2d 651; *Baltimore v. Sitnick & Firey,* 254 Md. 303, 322, 255 A.2d 376 (1969).

As earlier observed, the legislative authority vested in the Administration to promulgate rules and regulations governing child care facilities, § 5–506(b) of the Family Law Article, resulted in COMAR 07.02.13.07, which explicitly requires a licensed child care facility to comply with the zoning ordinances of political subdivisions. The validity of this provision is presumed when, as here, it is "consistent with the letter and spirit of the statute under which the agency acts." *Sullivan v. Bd. of Licensing Comm'rs,* 293 Md. 113, 121, 442 A.2d 558 (1982). Moreover, in such

circumstances, the agency rule is entitled to considerable weight in determining the meaning of Subtitle 5's provisions relating to child care facilities. *See McCullough v. Wittner*, 314 Md. 602, 612, 552 A.2d 881 (1989); *Sinai Hosp. v. Dep't of Employment*, 309 Md. 28, 46, 522 A.2d 382 (1987); *Consumer Protection v. Consumer Pub.*, 304 Md. 731, 759, 501 A.2d 48 (1985).[5]

In a nutshell, therefore, approval of the location of child care facilities under Baltimore County's zoning ordinances is not preempted by the statewide statutory scheme.[6] Nor is there an irreconcilable conflict between the State law and the county zoning ordinance. This is not a case of a political subdivision prohibiting by local law what a State by public general law has permitted. The BCZR does not prohibit the operation of child care facilities; rather, it expressly allows such facilities to operate subject to compliance with zoning regulations. *See County Council v. Montgomery Ass'n, supra,* 274 Md. at 57–58, 325 A.2d 112; *Baltimore v. Sitnick & Firey, supra,* 254 Md. at 317, 255 A.2d 376.[7]

JUDGMENT AFFIRMED, WITH COSTS.

---

**5.** The Methodist Board, citing 72 Op.Atty.Gen'l 309 (1987), argues that COMAR 07.02.13.07 requires only that child care facilities comply with local zoning requirements as to their physical plants, local environmental safety, health and fire requirements and not as to location requirements. However, the Attorney General was there interpreting a specific Juvenile Services Agency regulation. The regulations of the Administration precisely define and thus distinguish a "child care facility" from a "physical facility" of a child care facility at 07.02.13.08D and .10D.

**6.** Of course, the General Assembly has been capable of expressly preempting municipal zoning regulations when it is of a mind to do so. For example, Code (1983 Repl.Vol.), § 3–705(d) of the Natural Resources Article explicitly exempts hazardous waste facilities, after receiving a certificate of public necessity, from local zoning regulations.

**7.** Child care facilities and institutions licensed by the Administration are permitted by special exception in a number of zoning districts in Baltimore County.