Dear Ms. Owens:
You have requested our opinion concerning the County's authority to enact an ordinance related to assisted living facilities. These facilities provide housing and support services to individuals who need assistance in performing the activities of daily living. You ask whether State law preempts the County from requiring these facilities to have emergency power sources.
You enclosed with your request a memorandum from the County Attorney that concludes that State law preempts such regulatory action by the County. For the reasons set forth in this opinion, we agree with the County Attorney that a local ordinance that established physical plant and emergency resource requirements specifically addressed to assisted living facilities would be preempted by State law. However, fire and building regulations that apply to structures generally, including those buildings used to provide assisted living services, would not be preempted.
 I Background Assisted Living Facilities
The term "assisted living" is generally used to refer to a category of care for an elderly or disabled person that provides "assistance . . .with the activities of daily living (walking, getting in and out of bed, bathing, eating, grooming, toileting), assistance with instrumental activities of daily living (shopping, check-writing), supervision of varying degrees to ensure safety and protection, and some degree of medical intervention." Report of Governor's Task Force on Assisted Living (November 21, 1995) ("Task Force Report") at p. 2.
B. Regulation Before 1996
Prior to 1996, assisted living programs potentially fell within the regulatory jurisdiction of several State agencies. The Department of Health and Mental Hygiene ("DHMH") regulated "domiciliary care" facilities,[1] licensing those that cared for 5 or more individuals and registering smaller facilities. See Annotated Code of Maryland, Health-General Article ("HG"), § 19-301(n), § 19-302(a), § 19-324.1 et seq. (1995); COMAR 10.07.03 (1990). However, housing facilities for the elderly or disabled that were certified by the Office on Aging[2] or the Department of Human Resources were excepted from the DHMH regulatory scheme. See COMAR 10.07.03.02C, 10.07.03.05C (1990).
Under its Group Sheltered Housing Program, the Office on Aging certified and monitored facilities that provided housing and personal services for 4 to 15 elderly residents in a one family dwelling unit.See Annotated Code of Maryland, Article 70B, § 4; COMAR 14.11.07 (1988). The Department of Human Resources separately certified residential facilities that served up to eight disabled adults under its C.A.R.E. Program. See Annotated Code of Maryland, Article 88A, § 138ff; COMAR 07.06.15.07.
In addition, over two decades, several counties had enacted laws that encompassed some assisted living programs, among other types of facilities. In 1977, Montgomery County enacted legislation governing group homes. Montgomery County Code, Chapter 23A. The next year, Harford County enacted provisions governing "personal care boarding homes." Harford County Code § 199-1, et seq. Prince George's County enacted legislation covering "congregate living facilities" for the elderly or physically handicapped in 1985. Prince George's County Code, § 12-168, et seq. Most recently, in 1995, Charles County adopted legislation on "elderly care homes." Charles County Code, § 37-1 etseq.
C. State Assisted Living Legislation and Regulations
 1. Task Force on Assisted Living
In September 1995, the Governor appointed a Task Force on Assisted Living consisting of State and local officials, providers, and consumer representatives. The Task Force was charged generally with identifying the needs of residents of assisted living programs, suggesting reforms to meet those needs, and determining ways to provide services more efficiently. In addition, the Governor asked the Task Force "to review and propose modifications to existing laws, regulations, policies and procedures in order to provide more efficient and effective care to the citizens of Maryland; . . . to identify standards to be included in a single set of regulations; [and] . . . to propose the merger of various State Agency or Departmental responsibilities and to eliminate duplication." Task Force Report at p. 1.
The Task Force found that the need for assisted living facilities had increased in recent years and would continue to increase as the elderly population grew. Task Force Report at p. 2. Noting that there was little coordination among "a patchwork of different programs created at different times to meet different needs," the Task Force concluded that "no apparent reason or logic exists for the overall [assisted living] system in Maryland." Id. at p. 3. The result, according to the Task Force, was "various philosophies of regulation, duplication of regulation, and uneven monitoring and enforcement." Id. at p. 4. The Task Force also found confusion among consumers as to how to obtain information about programs and among providers as to how to enter the assisted living market. Id. at pp. 4-5.
The Task Force made a number of recommendations to address these deficiencies. First, it suggested that a comprehensive definition of assisted living be incorporated into State law — in particular, a definition that would distinguish assisted living programs from nursing homes, services provided by family members, and services provided in an individual's personal residence by a home health agency. Task Force Report at pp. 6-7. The Task Force also suggested that DHMH serve as the lead agency, with regulatory oversight and accountability for the regulation of those facilities that came within the new definition, and as "the point of entry" for both consumers and providers. To those ends, the Task Force recommended that DHMH establish a streamlined licensing process, act as a clearinghouse on information about assisted living for various State and local agencies, and develop "a single and uniform set of regulations" to govern levels of service, quality standards, and staffing of assisted living facilities. Id. at pp. 7-8. The Task Force envisioned that monitoring and inspection of facilities could be delegated to other State and local agencies. Id. It also recommended that State and local fire and building codes be reviewed and modified to promote the goals identified by the Task Force. Id.
 2. 1996 Assisted Living Legislation
During its 1996 session, the General Assembly enacted legislation that incorporated many of the Task Force recommendations. Chapter 147, Laws of Maryland 1996. That legislation added a definition of "assisted living program" to State law[3] and consolidated State regulation of assisted living programs in a new subtitle of the Health-General Article HG § 19-1801 et seq. Consistent with the Task Force recommendation, the statute sought to streamline and simplify the process for obtaining information on assisted living facilities and to reduce confusion over licensing authority. The Legislature designated DHMH as the lead agency for supervising and monitoring a "statewide interagency system for regulating the establishment and operation of assisted living programs." HG § 19-1802. DHMH was designated as "the point of entry" for persons seeking information on assisted living and was directed to share information with, and delegate monitoring and inspection responsibilities to, other agencies. HG § 19-1804.
Among other things, the General Assembly charged DHMH with defining levels of care in assisted living programs; licensing facilities in accordance with the level of care provided; promoting affordable and accessible assisted living facilities throughout the State; establishing and enforcing quality standards; requiring periodic inspections; and adopting regulations to implement the program. HG § 19-1805. Seealso Chapter 147, § 2, Laws of Maryland 1996. The legislation required both the Office on Aging and the Department of Human Resources to coordinate their own programs with the DHMH regulations.[4] See
Article 70B, § 4(d); Article 88A, § 140(e).
The 1996 legislation also established an Assisted Living Programs Board, and directed it to develop a statewide policy on assisted living programs, to coordinate agency responsibilities, and to establish interagency agreements.[5] See Annotated Code of Maryland, Article 41, § 10-601. Finally, the legislation authorized the Office on Aging to develop assisted living programs, and to make use of available subsidies. See Article 70B, § 4(d).
 3. DHMH Regulations
As directed by the statute, DHMH adopted comprehensive regulations for assisted living programs.[6] See COMAR 10.07.14. These regulations superseded existing regulations governing domiciliary care facilities in COMAR 10.07.03, which were simultaneously repealed. The new regulations address license application and renewal, levels of care, resident agreement requirements, staffing levels and qualifications, services, resident rights, physical plant requirements, compliance monitoring and sanctions. Like the old regulations concerning domiciliary care facilities, the assisted living regulations address physical plant requirements in some detail, including cleanliness, furnishings, storage, water supply, sewage disposal, building security, fire and emergency precautions, living space, bathroom and kitchen facilities, closet space, illumination, heating, ventilation and air conditioning, laundry facilities, and telephone availability. Compare COMAR10.07.14.31 through 10.07.14.44 (1999) with COMAR 10.07.03.10 through10.07.03.15,.19 (1990). The new regulations do not require that an assisted living program have an emergency power source.[7]
 II Preemption Analysis
A. Modes of Preemption
The General Assembly may preempt, or reserve to exclusive State control, an entire field of State concern. When the Legislature has exercised this power, local jurisdictions are generally precluded from passing local laws, ordinances, or regulations concerning that field.
The Court of Appeals has held that State preemption of a local law may be established in three ways: (1) preemption by conflict; (2) express preemption; or (3) implied preemption. Holiday Point Marina Partners v.Anne Arundel County, 349 Md. 190, 209, 707 A.2d 829 (1998). A local ordinance is preempted by conflict "when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." Holiday Point, 349 Md. at 210. Express preemption is accomplished by statutory language that prohibits local legislation. See, e.g., Montgomery County v. Atlantic Guns,Inc., 302 Md. 540, 489 A.2d 1114 (1985).
In the absence of an express provision, the Court of Appeals has found an implicit intent to preempt when the "Legislature has acted with such force that an intent by the State to occupy the entire field must be implied . . . ." County Council v. Montgomery Ass'n, 274 Md. 52, 59,333 A.2d 596 (1975). Although there is no particular formula for evaluating whether a local regulation has been preempted by implication, the primary factor to be considered is the "comprehensiveness with which the General Assembly has legislated in the field." Board of Child Care v. Harker,316 Md. 683, 697, 561 A.2d 219 (1989); see also Allied Vending, Inc. v. Cityof Bowie, 332 Md. 279, 298, 631 A.2d 77 (1993). The Court of Appeals has also identified a number of "secondary factors" that can be considered to discern legislative intent to preempt local legislation:
 1. whether local laws existed prior to the enactment of the State laws governing the same subject matter;
 2. whether the State laws provide for pervasive administrative regulation;
 3. whether the local ordinance regulates an area in which some local control has traditionally been allowed;
 4. whether the State law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances;
 5. whether a State agency responsible for administering and enforcing the State law has recognized local authority to act in the field;
 6. whether the particular aspect of the field sought to be regulated by the local government has been addressed by the State legislation; and
 7. whether a two-tiered regulatory process would engender chaos and confusion if local laws were not preempted.
Allied Vending, 332 Md. at 299-300. Finally, even when the General Assembly comprehensively regulates an area, it "may also intend to leave some specific matters in that field open to local legislation." HolidayPoint Marina Partners, 349 Md. at 213.
The 1996 State legislation concerning assisted living programs does not expressly preempt local regulation. Nor is there necessarily a conflict between the proposed County ordinance that would require an emergency power source and the State regulations that are silent on the subject. Accordingly, the answer to your inquiry turns on whether the State law implicitly preempts this type of local regulation.
B. Implied Preemption of Local Regulation Requiring Emergency Power Source
 1. Comprehensiveness of State Regulation
The 1996 legislation was an effort to create a unified system of regulation of assisted living facilities. As recommended by the Task Force on Assisted Living, the General Assembly commissioned DHMH to be the "single point of entry" for both consumers and providers and to supervise statewide regulation of the creation and operation of assisted living programs. It also directed DHMH to adopt regulations on all aspects of assisted living programs including quality standards, inspections, levels of care, qualifications and training of staff, and residents' rights. In our opinion, this is the sort of comprehensive regulation that demonstrates legislative intent to preempt the field.
DHMH regulations implementing the assisted living law establish a comprehensive system of oversight. Those regulations acknowledge the authority of political subdivisions or incorporate local regulation in certain respects. In particular, an applicant for a license to operate an assisted living facility must document local zoning approval and must notify the local health department and local agency on aging of the license application. COMAR 10.07.14.06A(4)(g)-(h).
With respect to physical plant requirements and emergency precautions, the DHMH regulations prescribe specific standards for assisted living facilities but, in certain respects, incorporate local building and fire codes by reference. For example, a regulation entitled "Fire and other Emergency Precautions" requires assisted living facilities to comply with "[a]ll applicable local fire and building codes." COMAR 10.07.14.36A(1) (emphasis added). To compute the usable floor space in a facility, one is to exclude spaces in which the ceiling height is less than that deemed acceptable for habitable space in the local building code. COMAR10.07.14.38A(2)(g). Any space heaters used in an assisted living facility must have the approval of State or local fire authorities. COMAR 10.07.14.42A. Radiator shields must comply with State and local fire codes. COMAR 10.07.14.43B(4). In each instance, the cross-reference to local regulation appears to contemplate generally applicable building and fire safety regulations, and not local regulations peculiar to assisted living facilities that set special building or emergency requirements.
The various State regulations that previously encompassed assisted living facilities acknowledged a broader scope for local regulation of such facilities. A comparison of the earlier regulations with those issued as a result of the 1996 legislation confirms the intent to displace local regulation. For example, as part of the former licensing procedure for domiciliary care facilities, an applicant was required to submit proof to DHMH of compliance with local zoning requirements and with any other "standards" of the political subdivision where it was located. COMAR 10.07.03.06C(2)-(3) (1990). In a significant departure from the former domiciliary care facility regulations, compliance with other local "standards" aside from zoning is not now a prerequisite to a State license to operate an assisted living facility. COMAR10.07.14.06A(4)(g), (h).
Similarly, as a prerequisite to obtaining a certificate to operate a group sheltered housing facility under the former Office on Aging regulations, an applicant was required to document compliance not only with local zoning, but "with any other applicable local certification requirements." COMAR 14.11.07.11E (1988). By contrast, the current Department of Aging regulations for assisted living programs make no reference to local certifications. See COMAR 14.11.07.
Thus, the 1996 statute, together with its administrative implementation, reveals an intent to fully regulate this field and to displace local regulations other than zoning and local building and fire safety regulations.
 2. Secondary Factors
Consideration of the secondary factors identified by the Court of Appeals in its preemption cases reinforces this conclusion. First, while there have been isolated local efforts to regulate group homes for elderly or disabled adults, the vast majority of Maryland political subdivisions do not specifically regulate assisted living facilities. Second, the DHMH regulations are comprehensive and pervasive. The General Assembly's charge to DHMH embraces all aspects of assisted living programs — quality standards, a resident bill of rights, staffing qualifications, and defining levels of care.
Third, unlike the longstanding recognition of local control over zoning and land use,[8] there is no tradition of local regulation of the non-zoning aspects of assisted living facilities. Special regulation of these facilities at the local level is limited and relatively recent in origin. The Task Force[9] and the Legislature were aware of the few possibly conflicting local laws, but the legislation clearly sought to impose uniform standards for assisted living facilities. In addition, at least one of the local laws that potentially established overlapping local regulation has an explicit exception for facilities licensed by the State. See Montgomery County Code, § 23A-2(a) (group home regulations do not apply to certain licensed facilities).
Fourth, the 1996 legislation does not expressly provide for concurrent State and local legislative authority. Neither the statute nor DHMH regulations contemplate parallel local regulations specific to assisted living facilities that deviate from State standards.
Fifth, the references to local authority in the DHMH regulations are specific and limited. As noted above, the implementing regulations specifically require compliance with local zoning ordinances but onlynotification of the local health department and agency on aging of a license application. While the DHMH regulations also refer to local building and fire codes, they appear to contemplate requirements in generally applicable regulations and not requirements drawn specifically for assisted living facilities.
Sixth, the State regulations explicitly address physical plant requirements and emergency precautions. COMAR 10.07.14.31-43. Those regulations do not require emergency power sources.
Finally, separate local regulations in each county governing physical plant and emergency precautions for assisted living facilities would likely create confusion for providers and would impede the effort to "promote affordable and accessible assisted living programs throughout the State." HG § 19-1805(a)(4). DHMH, the agency charged with the task of advancing this goal through carefully balanced regulation, had to consider whether the added cost of particular safeguards was justified by the benefits. A local government lacks authority to reach a different judgment, one that could potentially constrict the supply of assisted living facilities.
C. Summary
In a prior opinion, this Office undertook a similar analysis of State regulation of child care homes and institutions and concluded that "State law and regulations have fully occupied the field . . . ." 72 Opinions ofthe Attorney General 188 (1987). Like the regulations adopted by DHMH for assisted living programs, those regulations addressed the number, qualifications, and duties of staff, authorized inspections to determine compliance, and set requirements for services and admission standards. While the 1987 opinion concluded that the State had preempted local laws and regulations that specifically addressed licensed child care facilities, it was careful to stress that generally applicable local laws still governed such facilities:
 That is not to say, however, that county laws are wholly inapplicable to State-licensed child care facilities. We do not think that the General Assembly has clearly expressed an intent to preempt the power of local jurisdictions to regulate health, safety, and land use matters in general, merely because those general regulations are applicable to State-licensed child care facilities. Rather, we think that local jurisdictions retain their power to ensure that the physical plant of any facility will be compatible with the neighborhood in which it is located and will conform to health and safety standards that the jurisdiction has found to be generally necessary.
Id. at 197-98. The same analysis applies to assisted living facilities licensed by DHMH. There is no indication that the Legislature meant to preempt local zoning or other land use ordinances. Nor is there any indication of an intent to preempt general fire and building regulations. Thus, for example, if Anne Arundel County mandated that all residential buildings with more than 16 occupants install an emergency power source, this mandate would apply to assisted living facilities of that size.
 III Conclusion
In summary, we conclude that State law would preempt a local ordinance addressed solely to assisted living facilities concerning emergency power sources. However, zoning and other land use regulations, and generally applicable fire and building regulations, would not be preempted.
 Very truly yours, J. Joseph Curran, Jr. Attorney General
 Robert N. McDonald[1]
Chief Counsel Opinions Advice
[1] "Domiciliary care" is defined as:
 services that are provided to aged or disabled individuals in a protective, institutional or home-type environment.
HG § 19-301(f)(1). Such care includes shelter, housekeeping services, board, facilities and resources for daily living, and "personal surveillance or direction in the activities of daily living." HG § 19-301(f)(2).
[2] The Office on Aging became the Department of Aging in 1998. See Chapters 573, 574, Laws of Maryland 1998.
[3] The statute defines the term as follows:
 (1) "Assisted living program" means a residential or facility-based program that provides housing and supportive services, supervision, personalized assistance, health-related services, or a combination thereof that meets the needs of individuals who are unable to perform or who need assistance in performing the activities of daily living or instrumental activities of daily living in a way that promotes optimum dignity and independence for the individuals.
(2) "Assisted living program" does not include:
 (i) A nursing home, as defined under § 19-301 of this title;
 (ii) A state facility, as defined under § 10-101 of this article;
 (iii) A program licensed by the Department under Title 7 or Title 10 of this article;
 (iv) A hospice care program regulated by the Department under Subtitle 9 of this title;
(v) Services provided by family members; or
 (vi) Services provided in an individual's own home.
HG § 19-1801(1).
[4] After passage of the legislation, the (now) Department of Aging repealed its regulations that providing for the certification of "group sheltered housing" and replaced them with new regulations governing subsidies to residents of certain assisted living facilities licensed by DHMH. See 26:17 Md. Reg. 1325 (August 13, 1999) repealing existingregulations and adopting new regulations codified at COMAR 14.11.07.
[5] The legislation eliminated other advisory boards with potentially overlapping responsibilities — the Domiciliary Care Facilities Board and the advisory board to the C.A.R.E. program.
[6] Subsequent legislation delayed the effect of the regulations, to permit smaller facilities additional time to come into compliance. See
Chapter 646, Laws of Maryland 1998. The regulations ultimately became effective on January 1, 1999.
[7] As the County Attorney's Office noted, by contrast, the State nursing home regulations require comprehensive care facilities and extended care facilities to have emergency electrical power. See COMAR10.07.02.26F. We understand that a provision requiring assisted living facilities to have emergency power sources available was considered, but rejected, by the committee that drafted the regulations.
[8] The Court of Appeals has rejected arguments that local zoning ordinances were preempted by State legislation on several occasions.See Holiday Point Marina Partners v. Anne Arundel County, 349 Md. 190,707 A.2d 829 (1998) (State regulation of tidal waters did not preempt county zoning ordinance limiting marina facilities); Board of Child Carev. Harker, 316 Md. 683, 561 A.2d 219 (1989) (State licensing and regulation of child care facilities did not preempt local zoning regulation); Ad + Soil, Inc. v. County Commissioners, 307 Md. 307,513 A.2d 893 (1986) (county zoning ordinance concerning sludge transfer station not preempted by State statutes governing sludge utilization).
[9] The Task Force expressly noted that "several members of the Task Force expressed concerns over local government ordinances which exceed State requirements. Charles, Montgomery, Prince George's and Harford Counties all impose more stringent or different requirements on providers." Task Force Report at p. 4.
[1] Former Assistant Attorney General John F. Lessner contributed substantially to the preparation of this opinion prior to his resignation from the Office.
 *Page 284