******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

TOWN OF ROCKY HILL *v.* SECURECARE
REALTY, LLC, ET AL.
(SC 19275)

Rogers, C. J., and Palmer, Eveleigh, Espinosa, Robinson and Vertefeuille, Js.

*Argued September 23, 2014—officially released January 6, 2015*

*Proloy K. Das*, with whom, were *Morris R. Borea*, and, on the brief, *Thomas A. Plotkin*, for the appellant (plaintiff).

*Jonathan M. Starble*, for the appellees (defendants).

*Ross H. Garber* and *Michael A. King* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Opinion*

VERTEFEUILLE, J. This case presents the question of whether a group of private entities, who together have contracted with the state pursuant to General Statutes § 17b-372a[1] to provide nursing home services to state prisoners and others in state custody, comprise an "arm of the state" that may assert the defense of sovereign immunity in an action brought against them by a municipality claiming noncompliance with its zoning regulations. The plaintiff, the town of Rocky Hill, appeals from the trial court's dismissal of an action for declaratory and injunctive relief that the plaintiff had brought against the defendants, SecureCare Realty, LLC (SecureCare), the owner of the real property at issue, and iCare Management, LLC (iCare), a management and consulting firm overseeing the development of a § 17b-372a nursing home on that property. A third entity, SecureCare Options, LLC (Options), was formed by iCare to lease the property from SecureCare and to operate the nursing home, but is not a party to this action. The plaintiff claims that the trial court improperly dismissed the action against the defendants because, contrary to the conclusions of the trial court, (1) they are not an "arm of the state," entitled to sovereign immunity, pursuant to the test articulated by this court in *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 98–100, 861 A.2d 1160 (2004), and (2) the legislature, by its enactment of § 17b-372a, did not intend to preempt the application of local zoning laws to the owners and operators of private nursing home properties with which the state contracts under the authority of that provision. We agree with both of these claims and, accordingly, reverse the judgment of the trial court.[2]

The operative complaint, dated January 23, 2013, contains the following allegations, which the defendants did not dispute. SecureCare is a private company that owns property in the town of Rocky Hill, on which a nursing home facility previously had been operated. The property is located in a district that is zoned for residential use. SecureCare has neither sought nor received from the plaintiff any special use permits in connection with its use of the property.[3]

iCare is a private management and consulting company that, at the time the action was commenced, was negotiating with the state to reopen the nursing home facility on the property and to place at that facility individuals who were in state custody. In connection with this plan, iCare formed SecureCare for purposes of owning the property.

The project contemplated by the defendants and the state was authorized by No. 11-44, § 117, of the 2011 Public Acts, codified at § 17b-372a, which permits certain state officials to "establish or contract for the establishment of" nursing home facilities for state prisoners

and individuals receiving services from the Department of Mental Health and Addiction Services (department). See footnote 1 of this opinion. According to the complaint, "[t]he rationale behind [this] legislation is to place prisoners who would otherwise be incarcerated in state correctional facilities in private facilities so that their health care costs would be covered by the federal Medicaid program."[4] The complaint alleged further that the legislature did not intend for such facilities to be located in residential areas, and that the state, when requesting proposals, had indicated that property on which a § 17b-372a facility would be located must already be properly zoned for that use.

According to the complaint, the state recently had announced plans for a "§ 17b-372a [f]acility to be owned and operated by a private contractor and located at the [p]roperty [owned by SecureCare]." The plaintiff sought declaratory and injunctive relief, namely, a determination that the defendants were prohibited from opening or operating the proposed facility on the property because such use would be noncompliant with town zoning regulations and did not constitute a prior nonconforming use, and no special permit had been sought or issued.[5]

The defendants responded to the plaintiff's complaint by filing a motion to dismiss. Therein, they claimed that the action was barred by sovereign immunity and, therefore, should be dismissed for lack of subject matter jurisdiction. According to the defendants, they were an "arm of the state" pursuant to the test articulated by this court in *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, and, therefore, immune from suit. The defendants filed a number of affidavits and exhibits in support of their motion to dismiss, including: the department's February 6, 2012 request for proposals concerning the nursing home project and iCare's March 30, 2012 response thereto; a June 11, 2012 letter from the department awarding iCare the opportunity to enter contract negotiations; the affidavit of Chris S. Wright, who is president of iCare, SecureCare and Options; Wright's September 6, 2012 letter to a department official discussing iCare's progress and requesting certain contractual assurances before iCare would move forward with the project; an October 5, 2012 letter agreement subsequently executed by iCare and the department; a January 30, 2013 start-up contract between Options and the department; a series of correspondence between Jonathan Starble, the defendants' counsel, and Kim Ricci, the plaintiff's zoning enforcement officer; and a document, captioned "Frequently Asked Questions," that was released by the department on December 11, 2012, to provide information to the public about the nursing home project. The plaintiff filed an objection to the motion to dismiss along with several exhibits and affidavits, including the affidavit of Ricci and a transcript from the department's March 5,

2012 bidders' conference for the nursing home project.

The department's February 6, 2012 request for proposals described the general parameters for the proposed nursing home project and invited qualified bidders to apply. It indicated that existing nursing home facilities were preferred, and that "[t]he proposed building must be properly zoned" to accommodate the identified clientele. Regarding proposed sites for the facility, bidders were directed to identify and describe the features of specific locations, and to include "proof of compliance with zoning . . . ." Consistent with the request for proposals, the bidders' conference transcript reflects that, at that conference, a representative of the Department of Correction informed prospective bidders that the state was looking for a facility that already was properly zoned for the nursing home project. The request for proposals also required bidders to provide detailed evidence of their financial strength and stability, including an explanation of how they would fund the project, and to include proof of any liability insurance they presently held.

In its response to the request for proposals, iCare stated, in regard to location, that it was "considering the purchase of a presently vacant and appropriately zoned" nursing home facility. It indicated further that it would form a new entity to manage the proposed facility, if it were awarded the contract, and that the new entity would provide "a substantial real estate tax base for the local municipality" in which the facility was located.[6] iCare also represented that it currently managed nine other nursing home facilities in Connecticut, all of which had been purchased from state receivership.[7]

In his September 6, 2012 letter to the department, following the department's offer to iCare to enter contract negotiations, Wright informed the department that iCare was pursuing the purchase of the existing facility in the town of Rocky Hill for the project. He stated that iCare had engaged legal counsel "to investigate relevant zoning issues" with the plaintiff, and that counsel "believe[d] that a nursing home could be reopened at this site without any public zoning hearing or significant permitting process."[8]

In his affidavit, Wright attested, in relevant part, to the following: On October 5, 2012, the department and iCare had entered a letter agreement regarding development of the nursing home project. SecureCare was created on October 31, 2012, for the sole purpose of owning the nursing home property, and had purchased it in November, 2012, for $1.9 million plus $119,000 in associated costs. Additionally, Options was created on the same day as SecureCare, for the sole purpose of operating, as a tenant, that nursing home property. On January 30, 2013, the department and Options had entered a start-up contract. Finally, the department and

Options were in the process of finalizing an "[o]perations [c]ontract."

The October 5, 2012 letter agreement was signed by Wright, as president of iCare, and a representative of the department. Generally, it provided that the state would reimburse iCare "or its affiliates" for up to $500,000 of their "start-up costs such as hiring of personnel, capital improvements, and licensure expenses," upon the purchase of a nursing home facility but prior to licensure of that facility. Additionally, the letter agreement provided that, in the event the facility never received licensure or admitted clients, or subsequently was closed due to state action, the state would reimburse iCare up to $500,000 in the first year, and an unspecified "diminishing amount" in the second year, "for reasonable close-down costs and losses associated with owning the real estate."[9]

The January 30, 2013 start-up contract is a standardized form agreement used by the department to contract for personal services, with some customization specific to the nursing home project. Under the heading of "[d]escription of [s]ervices," it stated that Options will "procure and develop" the nursing home at issue, "and . . . take all steps necessary to prepare [it] for operation . . . ." The contract period is identified as the eight month period ending June 30, 2013, and the total cost of the contract is capped at $800,000, including approximately $322,866 of expenses already incurred. Similar to the letter agreement, the start-up contract provides for reimbursement of reasonable start-up expenses, including those incurred by iCare and SecureCare, such as "costs associated with the acquisition of the facility, staff recruitment costs, medical and program supplies needed prior to opening of the program, and . . . other [department approved] expenses . . . ." It also provides that, subject to a cap of $50,000, the state "shall . . . pay for all reasonable litigation costs and [attorney's] fees incurred in the defense of [this action] and any other similar legal challenge to the [f]acility's operation."

Additionally, the start-up contract requires Options to do the following things: comply with all applicable local, state and federal laws and regulations, including, in particular, "zoning"; indemnify the state and carry sufficient insurance to hold the state harmless "from any insurable cause whatsoever"; notify the department, in writing, if it is involved in litigation that could affect its ability to perform its contractual obligations; submit to an annual financial audit; allow a state auditor to access its accounts and records; and provide the department the "statistical, financial and programmatic information [that is] necessary to monitor and evaluate compliance with the contract."

The start-up contract further expresses the parties' intention to enter into a separate "[p]urchase of [s]er-

vice . . . contract governing the operation of the facility" and the department's reimbursement of Options for operating expenses. Finally, it includes the following statement: "The parties acknowledge that [Options] and its affiliate, [SecureCare], (a) were created for the purpose of [developing and operating a § 17b-372a nursing home facility] and (b) are financially dependent on the [s]tate due to the fact that the [s]tate shall be the sole referral source and primary payment source for the [f]acility."

After reviewing the foregoing evidence and concluding that there were no relevant facts in dispute requiring an evidentiary hearing, the trial court, in its memorandum of decision, dismissed the plaintiff's action for lack of subject matter jurisdiction.[10] The court analyzed the factors set forth in *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, and determined that, with the evidence presented, the defendants "persuasively [had] demonstrated that five of the eight criteria support[ed] the conclusion that [they were] an arm of the state." The trial court concluded additionally that, even if the defendants were not shielded by sovereign immunity as an arm of the state, the plaintiff's zoning authority over the project was "expressly preempted by § 17b-372a."[11] This appeal followed.

The plaintiff claims that the trial court improperly concluded that the defendants are an "arm of the state," absolutely shielded from suit by sovereign immunity, because none of the factors of *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, was conclusively proven. The plaintiff contends further that the court improperly held that local zoning regulations were preempted by § 17b-372a. The defendants argue, to the contrary, that the evidence presented supported a determination, pursuant to *Gordon*, that they were immune from suit, or, in the alternative, that the trial court correctly concluded that § 17b-372a preempts the application of local zoning regulations to the nursing home project. We agree with the plaintiff as to both of its claims.

We begin with the standard of review and the general principles governing a trial court's disposition of a motion to dismiss that challenges jurisdiction. The defendants' claim that they are an arm of the state is an assertion of "sovereign immunity [that] implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law." (Internal quotation marks omitted.) *Bloom* v. *Gershon*, 271 Conn. 96, 113, 856 A.2d 335 (2004); see also *Fresenius Medical Care Cardiovascular Resources, Inc.* v. *Puerto Rico & the Caribbean Cardiovascular Center Corp.*, 322 F.3d 56, 61 (1st Cir.) (question of whether entity is arm of state entitled to immunity is legal one), cert. denied, 540 U.S. 878, 124

S. Ct. 296, 157 L. Ed. 2d 142 (2003). The defendants'
claim that § 17b-372a preempts local zoning requires
an analysis of the statutory language and, therefore, also
presents a legal question. *Hackett* v. *J.L.G. Properties,
LLC*, 285 Conn. 498, 502–503, 940 A.2d 769 (2008).
Accordingly, "[o]ur review of the court's ultimate legal
conclusion[s] and resulting [determination] of the
motion to dismiss will be de novo." (Internal quotation
marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 200,
994 A.2d 106 (2010).

Depending on the record before it, a trial court ruling
on a motion to dismiss for lack of subject matter juris-
diction pursuant to Practice Book § 10-31 (a) (1) may
decide that motion on the basis of: "(1) the complaint
alone; (2) the complaint supplemented by undisputed
facts evidenced in the record; or (3) the complaint sup-
plemented by undisputed facts plus the court's resolu-
tion of disputed facts. . . . Different rules and
procedures will apply, depending on the state of the
record at the time the motion is filed." (Citation omitted;
internal quotation marks omitted.) *Conboy* v. *State*, 292
Conn. 642, 651, 974 A.2d 669 (2009).

If the court decides the motion on the basis of the
complaint alone, "it must consider the allegations of
the complaint in their most favorable light. . . . In this
regard, a court must take the facts to be those alleged in
the complaint, including those facts necessarily implied
from the allegations, construing them in a manner most
favorable to the pleader. . . .

"In contrast, if the complaint is supplemented by
*undisputed facts* established by affidavits submitted in
support of the motion to dismiss . . . other types of
undisputed evidence [for example, contract docu-
ments] . . . and/or public records of which judicial
notice may be taken . . . the trial court, in determining
the jurisdictional issue, may consider these supplemen-
tary undisputed facts and need not conclusively pre-
sume the validity of the allegations of the complaint.
. . . Rather, those allegations are tempered by the light
shed on them by the [supplementary undisputed facts].
. . . If affidavits and/or other evidence submitted in
support of a defendant's motion to dismiss conclusively
establish that jurisdiction is lacking, and the plaintiff
fails to undermine this conclusion with counteraffida-
vits . . . or other evidence, the trial court may dismiss
the action without further proceedings. . . . If, how-
ever, the defendant submits either no proof to rebut
the plaintiff's jurisdictional allegations . . . or only evi-
dence that fails to call those allegations into question
. . . the plaintiff need not supply counteraffidavits or
other evidence to support the complaint, but may rest
on the jurisdictional allegations therein. . . .

"Finally, where a jurisdictional determination is
dependent on the resolution of a critical factual dispute,
it cannot be decided on a motion to dismiss in the

absence of an evidentiary hearing to establish jurisdictional facts. . . . Likewise, if the question of jurisdiction is intertwined with the merits of the case, a court cannot resolve the jurisdictional question without a hearing to evaluate those merits. . . . An evidentiary hearing is necessary because a court cannot make a critical factual [jurisdictional] finding based on memoranda and documents submitted by the parties." (Citations omitted; emphasis in original; footnotes omitted; internal quotation marks omitted.) Id., 651–54.

In the present matter, although the parties submitted a significant amount of evidence, some of which was in conflict, the trial court decided the defendants' motion to dismiss on the basis of the legislation authorizing the nursing home project and on aspects of the evidence that were undisputed, namely, the nature, purpose and structuring of the project, as reflected in the various documentary evidence and Wright's affidavit, and certain terms of the letter agreement and start-up contract between the department and iCare and Options, respectively. Applying the factors established by *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, to these undisputed facts, the court concluded that a majority of those factors persuasively was established and, on balance, weighed in favor of affording sovereign immunity to the defendants. Analyzing § 17b-372a, the court also concluded, in the alternative, that that provision preempted local zoning regulations, regardless of whether the defendants were an arm of the state. Although we agree with the trial court that the evidence submitted by the parties did not give rise to any significant factual disputes, we disagree, for the reasons that follow, with the legal conclusions that the court drew on the basis of that evidence and its analysis of § 17b-372a.

I

The plaintiff claims first that the trial court improperly concluded that the defendants were an "arm of the state" and, therefore, shielded from suit by the defense of sovereign immunity. It contends that the court, on the evidentiary record before it, improperly found that the multifactor test set forth by this court in *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, for establishing if an entity is an "arm of the state" had been satisfied, as was the defendants' burden to show that they were entitled to sovereign immunity. The defendants, in response, contend that the court properly concluded that they were an "arm of the state" pursuant to *Gordon*. We agree with the plaintiff.[12]

In *Gordon*, this court held, in two actions seeking uninsured and underinsured motorist benefits, that a private management company, which had contracted with the state to operate certain of its public bus services, shared the state's sovereign immunity. Id., 85, 105. In so holding, we examined case law from analogous

contexts and other jurisdictions and provided a list of factors to guide courts in determining whether an entity should be immune from suit as an "arm of the state." Id., 93–98. Specifically, courts should consider whether: "(1) the state created the entity and expressed an intention in the enabling legislation that the entity be treated as a state agency; (2) the entity was created for a public purpose or to carry out a function integral to state government; (3) the entity is financially dependent on the state; (4) the entity's officers, directors or trustees are state functionaries; (5) the entity is operated by state employees; (6) the state has the right to control the entity; (7) the entity's budget, expenditures and appropriations are closely monitored by the state; and (8) a judgment against the entity would have the same effect as a judgment against the state." (Footnotes omitted.) Id., 98–100. Moreover, we explained that, "[t]o establish that an entity is an arm of the state, an entity need not satisfy every criteria. Rather, [a]ll relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." (Internal quotation marks omitted.) Id., 100. Finally, we recognized, the foregoing criteria are, to some degree, "interrelated and overlapping." Id.

In *Gordon*, we concluded that five of the eight factors had been satisfied and, on balance, weighed in favor of a conclusion that the defendant was an arm of the state. Id., 102–105. Notably, the case presented a unique and rather extreme set of facts. The state, pursuant to an expressly articulated legislative policy, essentially had taken over a formerly privately owned bus system, then hired management companies such as the defendant to run that system for the benefit of the public. Id., 85. The defendant was entirely dependent on the state because the state owned all of the assets required to run the system, including the buses, the buildings in which the defendant had its offices and everything in those buildings, and further, the defendant was required to turn all fare revenue over to the state as soon as it was collected. Id., 103. Moreover, the defendant's operating budget was financed entirely by the state on a month to month basis, requiring close monitoring and regular approval, and the state contractually was required to purchase liability insurance for the defendant and to indemnify it for any tort claims on which it became liable. Id., 86, 103. The overall system was subject to oversight through the Department of Transportation, thus making "all major issues of policy, planning and operations" within the control of the state. Id., 103. Finally, a judgment against the defendant would have had the same practical effect as a judgment against the state, because the state ultimately would have had to reimburse the defendant for any damages award pursuant to the indemnification requirement, and additionally, it would have had to purchase uninsured/ underinsured motorist coverage for its entire fleet of

buses. Id., 104. As should be clear from its context, our holding in *Gordon* was not intended to apply broadly to all private entities providing contractual services to the state, but rather, was narrowly confined to situations presenting an extraordinary level of state dependency and control.[13]

When applying the various factors under *Gordon*, courts must remain cognizant of the rationale underlying the doctrine of sovereign immunity. Although, in the past, we have explained that doctrine in theoretical terms, namely, "that there can be no legal right as against the authority that makes the law on which the right depends . . . [t]he modern rationale for the doctrine . . . rests on the more practical ground that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property." (Citation omitted; internal quotation marks omitted.) *Shay* v. *Rossi*, 253 Conn. 134, 165–66, 749 A.2d 1147 (2000), overruled in part by *Miller* v. *Egan*, 265 Conn. 301, 325, 828 A.2d 549 (2003); see *C. R. Klewin Northeast, LLC* v. *Fleming*, 284 Conn. 250, 259 n.6, 932 A.2d 1053 (2007). Pursuant to this rationale, "the doctrine protects the state from unconsented to litigation, as well as unconsented to liability." *Shay* v. *Rossi*, 166.

Additionally, as the United States Court of Appeals for the Eleventh Circuit has explained in the analogous context of eleventh amendment immunity,[14] when a corporate entity attempts to assert a state's sovereignty without clear legislative support for that position, "there is great reason for caution"; *Fresenius Medical Care Cardiovascular Resources, Inc.* v. *Puerto Rico & the Caribbean Cardiovascular Center Corp.*, supra, 322 F.3d 63; due to the broader consequences that potentially could result from conferring immunity. Id., 63–64. In the present matter, for example, a holding that the defendants essentially are state actors might not just relieve them from the obligation of complying with zoning regulations, but also could shield them from municipal taxation and from various future lawsuits such as tort actions brought by their employees or patients or others harmed by their negligent acts. This could create a disincentive to safe practices. See *Veolia Water Indianapolis, LLC* v. *National Trust Ins. Co.*, 3 N.E.3d 1, 9 (Ind.) (observing that "granting common law sovereign immunity to a private [for profit] company . . . invites negligence"), reh. denied, 12 N.E.3d 240 (2014). In short, sovereign immunity is "strong medicine" that should not be granted lightly to private actors. *Del Campo* v. *Kennedy*, 517 F.3d 1070, 1075–76 (9th Cir. 2008).

Considering the eight *Gordon* factors in relation to the facts of this case, the trial court concluded that five of them had been persuasively demonstrated by the

defendants and that together, those five factors "clearly weigh[ed] in favor of the defendants and require[d] [the] court to find that [they] are in fact an arm of the state entitled to sovereign immunity." We will examine each of those factors in turn, reviewing the court's subsidiary and ultimate conclusions.[15]

The trial court concluded first that the defendants were " 'created to carry out a function integral to state government,' " namely, to provide nursing home services, pursuant to § 17b-372a, to individuals who either are transitioning from a correctional facility or are receiving services from the state. According to the court, "the defendants were created exclusively for the purpose of running such a facility and . . . effectively [are] providing services on behalf of the state to individuals [who] would otherwise be receiving those services directly from the state." We agree with the trial court that the provision of vital nursing home services to those in state custody, or transitioning from it pursuant to General Statutes § 18-100i, is the performance of a governmental function,[16] specifically authorized by legislation that gave the state the option of either providing these services itself or contracting with another party. Cf. *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 102 (contractual services expressly authorized by legislation, in furtherance of stated public policy, fulfilled public purpose); see also footnotes 1 and 4 of this opinion. We agree further that the nursing home project was "created exclusively for [this] purpose," because, as evidenced by the start-up contract so stating, no patients other than those referred by the state will be admitted. Accordingly, we agree with the trial court that this factor weighs in favor of characterizing the defendants as an arm of the state.

The trial court concluded next that the defendants had shown that they were "at least partially, and perhaps completely, financially dependent on the state." (Internal quotation marks omitted.) The court cited the language of the start-up contract so declaring, with respect to Options and SecureCare, and opined that that statement was "supported by the substance of the relationship between the defendant[s] and the state." According to the court, because the state "is the only customer of the defendants, the defendants rely [on] the state for their financial success." The court further reasoned that the department is "required to reimburse the defendants for all start-up costs," and that future reimbursements also will be cost based.

We disagree with the trial court's reasoning as to the extent of the defendants' financial dependence on the state. Although the state may be Options', and by extension, SecureCare's, only "customer," it is not their only source of funding. Rather, a large portion of the nursing home project's funding appears to have come from iCare. Although iCare's financial information was not

part of the record; see footnote 7 of this opinion; it may be presumed from the fact that it was awarded the nursing home contract that it had substantial financial strength and stability, independent of this state contract, because that is what the request for proposals required. Moreover, it was able to provide SecureCare with approximately $2 million with which to purchase the nursing home property. Although the letter agreement and start-up contract provide for reimbursement of the various start-up costs for the facility, they do *not* provide for reimbursement of this purchase price unless the facility never opens or subsequently is closed, in which case reimbursement is limited to only $500,000 in the first year and some unspecified, "diminishing amount" in the second year. Additionally, a significant portion of the funding for the operation of the nursing home will derive from federal Medicaid dollars, further undercutting the defendants' claim that they are entirely financially dependent on the state.[17] Cf. *Fresenius Medical Care Cardiovascular Resources, Inc.* v. *Puerto Rico & the Caribbean Cardiovascular Center Corp.*, supra, 322 F.3d 74 ("doubtful" whether Medicaid funds should be considered in arm of state immunity analysis because "private, for-profit hospitals receive these reimbursements as a matter of course").

As to this factor, the facts of this case stand in contrast to those of *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 103, wherein the defendant's financial dependence was established by the fact that the state, in addition to paying all of the defendant's ongoing operating expenses and taking immediate ownership of its revenues, also "own[ed] all of the assets required to operate the defendant's business, including the buildings in which it ha[d] its offices, everything in the buildings, and the buses." Here, the defendants purchased and own their own physical plant, with any reimbursement by the state only partial and contingent on a shutdown. Additionally, the defendants will receive substantial federal funding in addition to direct state support. Accordingly, we conclude, contrary to the trial court, that the financial dependence factor does not weigh strongly in support of a holding that the defendants are an arm of the state.

The trial court also concluded that the defendants' budget, expenditures and appropriations were closely monitored by the state. The court rested this conclusion on the terms of the start-up contract between the department and Options making reimbursement cost based, requiring the submission of invoices showing actual costs, and providing for an audit of Options and state access to its records.

Although the cited terms suggest some monitoring by the state, that evidence is not overly compelling. First, the start-up contract covers only an eight month period and pertains largely to the procurement and

preparation of the nursing home facility, the hiring of its staff and the obtaining of licensure, prior to the admission of patients. Accordingly, any conclusion by the court as to how Options' budget, expenditures and appropriations would be monitored by the state once the facility commenced operating was entirely speculative. Although the start-up contract indicates that an additional operations agreement was being negotiated, there was no such agreement in evidence. In any event, even if the future operating agreement is presumed to include the same terms as the start-up agreement, we disagree that they establish that the defendants' budget, expenditures and appropriations are so closely monitored by the state that this factor weighs significantly in favor of a conclusion that they are an arm of the state. There is no detail as to the actual level of reporting or auditing required, nor is it apparent that these requirements are any more onerous than those imposed on any other contractor providing similar services to the state.[18]

The trial court next determined that "a judgment against [the defendants] would for all practical purposes be a judgment against the state." In this regard, the court noted the provisions of the letter agreement making the department "liable largely for the costs of the facility, including the start-up costs and . . . the close down costs," which includes "the price paid for the facility property." It reasoned that, if the plaintiff were successful in stopping the nursing home project, "it would be the state that absorbed the loss," and further, the state's interest in establishing a § 17b-372a facility would be thwarted. The court also cited the provision of the start-up contract requiring the state to pay the defendants' attorney's fees in this matter.

Although we agree that an adverse judgment in this matter would have some impact on the state, the trial court's determination as to this factor is overstated. It is true that, if this litigation were to cause the failure of the nursing home project, the state would suffer a significant monetary loss, and further, would need to pursue an alternative plan for the contracted for nursing home services. At the same time, however, the defendants would bear a significant portion of the monetary losses themselves. Pursuant to the letter agreement and the start-up contract, which appear to overlap, the state would remain liable for up to $800,000 in start-up costs, including up to $50,000 for attorney's fees incurred in this litigation. By the letter agreement, the state also agreed, in the event the facility never opens, to reimburse the defendants $500,000 for closing costs and losses associated with owning the facility, plus some unspecified "diminishing amount" in a subsequent year. Because the facility was purchased for $1.9 million, however, the defendants' financial exposure, in the event the nursing home cannot operate or be sold, remains substantial. In short, the effect of an adverse

judgment in this matter would be borne by *both* the defendants and the state. Compare *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 104 (because of contractual requirement that state indemnify defendant, state ultimately would be responsible for payment of any damages award; as practical matter, state also would be required to purchase uninsured and underinsured motorist insurance for all state owned buses operated by private companies).

In regard to other, potential litigation that could be brought against the defendants in the future, there is no indication that the state would share the defendants' exposure, assuming, again, that the operating contract includes provisions similar to those in the start-up contract. Pursuant to the start-up contract, Options was required to indemnify the state and to carry sufficient insurance to hold the state harmless "from any insurable cause whatsoever." The department's request for proposals also required bidders to provide proof "of general liability, professional liability and any other liability policies that [they held] which might provide coverage for activities associated with the [nursing home] [c]ontract . . . ." See *United States ex rel. Barron* v. *Deloitte & Touche, L.L.P.*, 381 F.3d 438, 440 (5th Cir. 2004) (no eleventh amendment immunity for private state contractor where agreement required contractor "to pay its own judgments and indemnify the [s]tate from any liability"), cert. denied sub nom. *National Heritage Ins. Co.* v. *United States ex rel. Barron*, 545 U.S. 1114, 125 S. Ct. 2905, 162 L. Ed. 2d 294 (2005).

Finally, the trial court concluded that the state had "some right to control the defendants," although in an indirect manner. The court explained that such indirect control emanated from the defendants' dependency on the state for their business, the cost based reimbursement structure and the state's ability to audit the defendants. Basically, the court reasoned, the state could control the defendants by refusing to fund practices it found excessive or wasteful. As previously explained, the defendants' financial dependency and the state's audit rights were overstated by the trial court. Moreover, the "indirect" control described by the trial court is not the type of control envisioned by *Gordon*, and in our view, does not weigh strongly in favor of a determination that the defendants are an arm of the state. In *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 103, the state, through the Department of Transportation, had "complete control over bus routes, schedules and fares. Thus, all major issues of policy, planning and operations relating to the enterprise's core government function [were] controlled by the state." Additionally, the defendant needed state approval to make purchases other than those of routine supplies, and it also needed approval to settle larger tort claims. Id., 86–87. There has been no similar showing of comprehensive and extensive state control in the present case. Specifically,

there is nothing in the start-up contract mandating particular policies, procedures or methods of structuring or operating the nursing home facility.[19] When a state contractor operates as "an autonomous entity" in executing its contract with the state, that circumstance weighs against a determination that it is an arm of the state. *United States ex rel. Barron* v. *Deloitte & Touche, L.L.P.*, supra, 381 F.3d 441.

The trial court also concluded, implicitly, that the first, fourth and fifth *Gordon* factors had not been established. We agree with that determination. Regarding the fourth and fifth factors, it is undisputed that the defendants' "officers, directors or trustees" are not "state functionaries," but rather, are private individuals, and that the nursing home staff are not state employees. These circumstances weigh additionally against the defendants as to the factor of state control. As to the first *Gordon* factor, the state clearly did not "create" the defendants, which are privately held entities, and there is nothing in § 17b-372a that remotely suggests a legislative intention that they be treated as arms of the state. Rather, the statute gave state officials the option of *either* establishing a facility themselves, *or* contracting out for that service, thereby creating the choice between providing the contemplated nursing home services as a state entity or as a private entity.[20] The department chose the latter approach, and it obviously understood and accepted the implications of doing so. Specifically, it made clear in its request for proposals, and at the bidders' conference, that potential contractors would be required to comply with local zoning regulations, and subsequent to awarding the contract to iCare, it assured the plaintiff and its citizens that the nursing home would pay property taxes. The start-up contract also requires Options to comply with zoning regulations.[21] That the department itself intended compliance with local regulation weighs significantly against a finding that the defendants are immune from such regulation. See *Montgomery* v. *Sherburne*, 147 Vt. 191, 192–93, 514 A.2d 702 (1986) (rejecting governmental immunity claim of private landowner who leased property to postal service where lease required compliance with local regulations and, prior to entering lease, postal service sent letter to landowner stating he had to comply with local zoning ordinance). Finally, the start-up contract also requires Options to carry liability insurance, to notify the department if it is sued and to hold the state harmless. These terms would make little sense unless the department envisioned the defendants as being amenable to suit.

Balancing all of the foregoing factors, we conclude, contrary to the trial court, that they clearly weigh against a conclusion that the defendants are an arm of the state, entitled to share the state's sovereign immunity. Although the defendants are performing a public function and the financial impact of an adverse judg-

ment would fall partly, and significantly, on the state, which is a particularly weighty consideration; *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 105; there is little to no support for the remaining six *Gordon* factors, particularly those that would evidence state control of the defendants and the nursing home. We emphasize that the extension of a state's immunity to a private, for profit entity should be a rare occurrence, and we conclude that the facts of this case do not present an appropriate occasion for affording such immunity. Our conclusion finds support in the decisions of other jurisdictions, which generally refuse to extend governmental immunity to private contractors, even when they are fulfilling important governmental functions. See, e.g., *Rosario* v. *American Corrective Counseling Services, Inc.*, 506 F.3d 1039, 1047 (11th Cir. 2007) (bad check restitution program run by private contractor for State's Attorney's Office not immune from suit alleging unfair debt collection practices); *Ormsby* v. *C.O.F. Training Services, Inc.*, 194 F. Supp. 2d 1177, 1179, 1187 (D. Kan. 2002) (nonprofit corporation overseeing provision of community services for developmentally disabled persons, pursuant to contract authorized by state statute, not immune, as arm of state, from employee's action for overtime wages), aff'd, 60 Fed. Appx. 724 (10th Cir. 2003);[22] *Veolia Water Indianapolis, LLC* v. *National Trust Ins. Co.*, supra, 3 N.E.3d 12 (private, for profit company operating city's water utility pursuant to agreement not entitled to sovereign immunity in action seeking damages for losses sustained due to inadequate water supply to fire hydrants); *Macon Assn. for Retarded Citizens* v. *County Planning & Zoning Commission*, 252 Ga. 484, 490, 314 S.E.2d 218 (governmentally financed nonprofit organization providing housing for developmentally disabled and mentally ill persons not exempt from local zoning regulations), appeal dismissed, 469 U.S. 802, 105 S. Ct. 57, 83 L. Ed. 2d 8 (1984); *Board of Childcare of the Baltimore Annual Conference of the Methodist Church* v. *Harker*, 316 Md. 683, 685, 693, 561 A.2d 219 (1989) (nonprofit corporation contracting with state to provide adolescent shelter facilities, in pursuit of statutory policy, not entitled to share state's immunity from municipal zoning ordinances); *Washington* v. *Central Bergen Community Mental Health Center, Inc.*, 156 N.J. Super. 388, 406–408, 383 A.2d 1194 (1978) (nonprofit corporation contracting with state to provide mental health care and services, pursuant to statutory plan, not immune from township zoning ordinance as arm of state government); but see *Portsmouth* v. *John T. Clark & Son, Inc.*, 117 N.H. 797, 798–99, 378 A.2d 1383 (1977) (private port terminal operating firm under contract to provide services to state port authority exempt from city zoning ordinance). For the foregoing reasons, we conclude that the trial court improperly dismissed the plaintiff's action for lack of subject matter jurisdiction on the basis that the defendants were immune from

suit as an arm of the state.

## II

The plaintiff also claims that the trial court improperly held that, by enacting § 17b-372a, the legislature intended to preempt the application of local zoning laws to facilities established on private land under the authority of that provision. According to the plaintiff, the legislature did not intend, by enacting § 17b-372a, to occupy the entire field as to regulation of nursing home location, and there is no irreconcilable conflict between that provision and local zoning laws such that the two cannot operate in tandem. The defendants contend that the court correctly concluded that § 17b-372a preempts town zoning regulations, because the legislature has expressed a clear intent that it do so. We agree with the plaintiff.[23]

According to the trial court, even if the defendants were not an arm of the state, the plaintiff's zoning authority, delegated to it by General Statutes §§ 8-1 through 8-13a, is "expressly preempted by § 17b-372a." The court reasoned that, in § 17b-372a, the language granting state officials the authority to "establish or contract for the establishment of a chronic or convalescent nursing home on state-owned or private property" is prefaced by the statement, "[n]otwithstanding any provision of the general statutes . . . ." (Internal quotation marks omitted.) See footnote 1 of this opinion. According to the trial court, the inclusion of these words evidenced the legislature's intent that "the state's ability to establish a [§ 17b-372a] nursing [home] facility preempts and surpasses the plaintiff's authority to zone local land use." The court also suggested that § 17b-372a and local zoning regulations covered the same field and are in conflict, although it did not provide a specific analysis in this regard.

"[A] local ordinance is preempted by a state statute whenever the legislature has demonstrated an intent to occupy the entire field of regulation on the matter . . . or . . . whenever the local ordinance irreconcilably conflicts with the statute. . . . Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives." (Internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 232, 662 A.2d 1179 (1995), on appeal after remand, 239 Conn. 515, 686 A.2d 481 (1996). "[T]hat a matter is of concurrent state and local concern is no impediment to the exercise of authority by a municipality through [local regulation], so long as there is not conflict with the state legislation. . . . Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion

does not, ipso facto, deprive the local government of the power to act in a more comprehensive, but not inconsistent, manner." (Internal quotation marks omitted.) *Greater New Haven Property Owners Assn.* v. *New Haven*, 288 Conn. 181, 190–91, 951 A.2d 551 (2008). A regulation is not necessarily inconsistent because it imposes standards additional to those required by a statute addressing the same subject matter. Id., 191. Where local regulation "merely enlarges on the provisions of a statute by requiring more than a statute, there is no conflict unless the legislature has limited the requirements for all cases." (Internal quotation marks omitted.) Id. As long as the local regulation does not "attempt to authorize that which the legislature has forbidden, or forbid that which the legislature has expressly authorized, there is no conflict." (Internal quotation marks omitted.) Id.

We disagree with the trial court's determination that the legislature, by its use in § 17b-372a of the broad and generalized prefatory language, "[n]otwithstanding any provision of the general statutes," intended to expressly preempt the application of local zoning regulations to nursing home projects established under the authority of that provision. Although that language, arguably, suggests that § 17b-372a should operate independently of any other statutory requirements, it says nothing about the continued applicability of municipal regulations, including zoning. When the legislature intends for a statutory provision to apply exclusive both of other statutes, and of other types of law, it knows how to say as much. See, e.g., General Statutes § 7-460b (disallowing residency requirement "[n]otwithstanding any provision of the general statutes or special act or local law, ordinance or charter"); General Statutes § 12-62*l* (a) (allowing for delayed property revaluations "[n]otwithstanding any provision of the general statutes, any municipal charter, any special act or any home rule ordinance"); General Statutes § 19a-342 (g) (providing that "[t]he provisions of this section [governing the prohibition of smoking in certain places] shall supersede and preempt the provisions of any municipal law or ordinance relative to smoking"); General Statutes § 23-36 (granting power to fire warden "[n]otwithstanding any provision of the general statutes or any municipal ordinance").

The trial court interpreted § 17b-372a as preempting zoning regulations more indirectly, by preempting entirely a town's statutorily conferred power to regulate zoning matters pursuant to §§ 8-1 through 8-13a. In other words, the court reasoned, the legislature, by use of the "notwithstanding" language, intended to preempt every other conceivably pertinent statute. Here, however, there is a strong indication that the legislature, by inclusion of the "notwithstanding" language, did *not* intend to render every other potentially pertinent statute inapplicable, namely, the last sentence of § 17b-

372a, which provides that "[a] nursing home developed under this section is not required to comply with the provisions of sections 17b-352 to 17b-354, inclusive." See footnote 1 of this opinion. If the legislature had intended by the prefatory language to render *all* other statutes inapplicable to § 17b-372a nursing home projects, there would have been no need also to include this more specific caveat. Accordingly, we disagree with the trial court's determination that the prefatory language of § 17b-372a expressly preempts municipal authority to regulate zoning.

We further disagree that local zoning regulations are impliedly preempted because they irreconcilably conflict with § 17b-372a or will frustrate the state's statutory objective of establishing nursing homes for those in state custody. As a general matter, zoning regulations do not bar outright particular uses of land, but require that they be conducted in certain areas or subject to various conditions. Thus, a regulation requiring a nursing home facility to be located in a particular zone, or to have a permit that might impose conditions on its operation, does not "attempt to . . . forbid that which the legislature has expressly authorized"; (internal quotation marks omitted) *Greater New Haven Property Owners Assn.* v. *New Haven*, supra, 288 Conn. 191; but rather, properly subjects what the legislature has authorized to additional requirements. Id.; see also *Hayward* v. *Gaston*, 542 A.2d 760, 767 (Del. 1988) (no conflict between statutes granting state power and duty to establish and operate residential mental health treatment centers and county zoning ordinances governing their location); *Board of Childcare of the Baltimore Annual Conference of the Methodist Church* v. *Harker*, supra, 316 Md. 699 (no conflict between state statutes licensing and regulating child care facilities and county zoning ordinances governing their location); *Washington* v. *Central Bergen Community Mental Health Center, Inc.*, supra, 156 N.J. Super. 409–11 (no conflict between state statute authorizing transitional residential facilities for former mental health patients and zoning ordinance that fails to permit such facilities in residential zone); *Nyack* v. *Daytop Village, Inc.*, 78 N.Y.2d 500, 508, 583 N.E.2d 928, 577 N.Y.S.2d 215 (1991) (no conflict between state regulation and licensing of substance abuse treatment facilities and local zoning governing placement of those facilities); but see *Region 10 Client Management, Inc.* v. *Hampstead*, 120 N.H. 885, 888, 424 A.2d 207 (1980) (state's statutory scheme of placing developmentally impaired individuals in various locations throughout state would be frustrated by applicability of local zoning restrictions to contemplated community residences); compare *Delinks* v. *McGowan*, 148 Conn. 614, 621, 623, 173 A.2d 488 (1961) (local regulation prohibiting use of property for "places of amusement" conflicted with state statute authorizing purchase of that property to provide ingress to hunting

and fishing preserves); *Los Angeles* v. *Dept. of Health*, 63 Cal. App. 3d 473, 475–76, 480, 133 Cal. Rptr. 771 (1976) (statute providing that state authorized foster or group home "shall be considered a residential use of property for purposes of zoning" and "shall be a permitted use in all residential zones" was intended to preempt municipal regulation [internal quotation marks omitted]).

We also disagree that requiring § 17b-372a facilities established on private property to be zoning compliant would frustrate the achievement of the state's objectives to an unacceptable degree. Although the number of potential locations for such facilities will be lessened due to the need to comply with zoning regulations, there is no reason to believe that the state's interest in establishing such facilities will be entirely thwarted. Pursuant to § 17b-372a, the state has the option of establishing a facility on its own property. Alternatively, it may contract for the establishment of a facility on private property that already is properly zoned, as it attempted to do in this case.[24] The parties ultimately disputed whether the facility was compliant with zoning as a preexisting nonconforming use but, because the case was prematurely dismissed, that dispute is yet to be resolved.

To summarize, we disagree with the trial court's determination that the defendants are an arm of the state and, therefore, entitled to assert the state's sovereign immunity. We disagree further that the legislature, in enacting § 17b-372a, intended to preempt the application of local zoning regulations to projects authorized by that provision, or that § 17b-372a and local zoning regulations irreconcilably conflict. We conclude, therefore, that the trial court improperly granted the defendants' motion to dismiss for lack of subject matter jurisdiction.

The judgment is reversed and the case is remanded with direction to deny the motion to dismiss and for further proceedings according to law.

In this opinion the other justices concurred.

[1] General Statutes § 17b-372a provides: "Notwithstanding any provision of the general statutes, the Commissioners of Social Services, Correction and Mental Health and Addiction Services may establish or contract for the establishment of a chronic or convalescent nursing home on state-owned or private property to care for individuals who (1) require the level of care provided in a nursing home, and (2) are transitioning from a correctional facility in the state, or (3) receive services from the Department of Mental Health and Addiction Services. A nursing home developed under this section is not required to comply with the provisions of sections 17b-352 to 17b-354, inclusive."

[2] The plaintiff claims further that precluding it from enforcing its zoning regulations against the defendants constitutes a violation of the home rule amendment of the state constitution. See Conn. Const., art. X, § 1. In light of our resolution of the plaintiff's other two claims, we need not address this issue.

[3] The previous use of the property as a nursing home began prior to the creation of zoning laws prohibiting that use, but had ceased in September, 2011, approximately thirteen months prior to SecureCare's purchase of the property. The parties dispute whether any prior nonconforming use of the

property had been abandoned.

[4] Subsequent to the passage of Public Act 11-44, the legislature in a special session passed another act; see Public Acts, Spec. Sess., June, 2012, No. 12-1, § 104; which is now codified at General Statutes § 18-100i. General Statutes § 18-100i (a) provides: "The Commissioner of Correction, at the commissioner's discretion, may release an inmate from the commissioner's custody, except an inmate convicted of a capital felony under the provisions of section 53a-54b in effect prior to April 25, 2012, or murder with special circumstances under the provisions of section 53a-54b in effect on or after April 25, 2012, for placement in a licensed community-based nursing home under contract with the state for the purpose of providing palliative and end-of-life care to the inmate if the medical director of the Department of Correction determines that the inmate is suffering from a terminal condition, disease or syndrome, or is so debilitated or incapacitated by a terminal condition, disease or syndrome as to (1) require continuous palliative or end-of-life care, or (2) be physically incapable of presenting a danger to society."

[5] The plaintiff also filed applications for a temporary injunction and a temporary restraining order, contemporaneously with its complaint, requesting that the defendants be immediately enjoined from taking any steps to open or operate the proposed facility.

[6] The "Frequently Asked Questions" document prepared by the department and released to the public after it entered into a contract with iCare, made a similar representation, namely, that the facility "will provide tax revenue [to the plaintiff] as a fully operational nursing home."

[7] The copy of iCare's response to the department's request for proposals that the defendants included as an exhibit to their motion to dismiss apparently is incomplete. Specifically, it does not include proof of its financial strength by way of audited financial statements, documentation of available lines of credit, short-term and long-term debt ratings, an analysis and evaluation of future financial condition and stability, proof of all existing liability insurance and an explanation of how the project would be funded. Pursuant to the request for proposals, all of these things "*must be included* [in a bidder's] proposal." (Emphasis added.)

[8] The correspondence between Starble and Ricci, which had been exchanged between August 31, 2012, and November 9, 2012, indicates that Starble had sought, and received from Ricci, confirmation that use of the property as "a convalescent home" was a legal nonconforming use that would be allowed to continue. In her subsequent affidavit, prepared after the commencement of this litigation, Ricci attested that the opinion she had provided to Starble was rendered without complete information, and was erroneous.

[9] Wright's September 6, 2012 letter to the department official had requested substantially broader assurances than those subsequently memorialized in the letter agreement. Essentially, he had requested that the state reimburse iCare for all of its start-up expenses and purchase the facility from iCare for the full price paid if the nursing home project were not finalized within nine months.

[10] Because the defendants' motion to dismiss challenged the court's jurisdiction, the court had deferred ruling on the plaintiff's applications for a temporary injunction and a restraining order until it ruled on the motion to dismiss. See footnote 5 of this opinion. In light of its dismissal of the case, it never ruled on those applications.

[11] The trial court further disagreed that sovereign immunity should not apply in the present matter because it would result in a violation of the plaintiff's constitutional rights, namely, its right to regulate zoning and the use of emergency resources pursuant to the home rule amendment of the state constitution. As we previously have explained, we need not review the trial court's determination in this regard because we conclude that the defendants are not immune from suit.

[12] The plaintiff contends, secondarily, that the court should not have dismissed its complaint, but rather, should have held an evidentiary hearing on the defendants' sovereign immunity claim after permitting discovery on the *Gordon* factors. The defendants counter that the court properly dismissed the complaint without a hearing because there were no material facts in dispute in regard to the issue of sovereign immunity. We conclude that a hearing was not necessary because the evidence presented conclusively established, contrary to the determination of the trial court, that the defendants were *not* an arm of the state.

[13] Despite the narrowness of our holding in *Gordon*, the General Assembly responded by overruling it legislatively. Specifically, in the following year, the legislature enacted No. 05-220, § 1, of the 2005 Public Acts, which amended General Statutes § 13b-34 (a), a provision that authorizes the Com-

missioner of Transportation to contract for transportation services, to add the following language: "Any person contracting with the state pursuant to this section for the provision of any transportation service shall not be considered an arm or agent of the state. Any damages caused by the operation of such transportation service by such person may be recovered in a civil action brought against such person in the superior court and such person may not assert the defense of sovereign immunity in such action."

[14] Eleventh amendment immunity shields nonconsenting states, and arms thereof, "from suits brought in federal courts by [their] own citizens as well as by citizens of another [s]tate." (Internal quotation marks omitted.) *Rosario* v. *American Corrective Counseling Services, Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007). The test to determine whether such immunity applies to entities other than a state includes factors similar to those enumerated in *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 98–100, specifically: "(1) how state law defines the entity, (2) what degree of control the [s]tate maintains over the entity, and (3) from where the entity derives its funds and who is responsible for judgments against the entity." (Internal quotation marks omitted.) *Rosario* v. *American Corrective Counseling Services, Inc.*, supra, 1043.

[15] Similar to the trial court, we will utilize a flexible, project based approach rather than attempt to analyze each *Gordon* factor with respect to iCare and SecureCare separately and without consideration of the nonparty entity Options. Strict adherence to corporate boundaries makes sense when, for example, determining whether one entity should be responsible for the liabilities of another. Taking a broader view is more appropriate in this context, however, to avoid a cramped, overly technical analysis that ignores the reality that iCare only recently created SecureCare and Options, specifically for purposes of the nursing home project, and, because of the three entities' interconnected nature, corporate resources and contractual obligations and benefits effectively flow amongst them.

[16] "The [United States] Supreme Court has interpreted the [e]ighth [a]mendment as guaranteeing a prisoner medical treatment for serious medical needs. *Estelle* v. *Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). Deliberate indifference by the government to such medical needs thus violates the [c]onstitution. [Id., 104–105.]" *Hilton* v. *Wright*, 673 F.3d 120, 127 (2d Cir. 2012).

[17] According to the department's "Frequently Asked Questions" document pertaining to the nursing home project, the state would be receiving "over $5.5 million in federal Medicaid reimbursement annually."

[18] The start-up contract provides that reimbursable expenses must be "consistent with the Office of Policy and Management Cost Standards," which are applicable to "all new contracts effective on or after January 1, 2007." Those standards, which are available on the Office of Policy and Management's website, indicate that they apply to any "contract between a [s]tate agency and an organization for the purchase of ongoing direct health and human services to agency clients." State of Connecticut, Office of Policy and Management, Cost Standards (September 1, 2006), p. 6, available at http//www.ct.gov/opm/lib/opm/POS_Cost_Standards_1-14-14.pdf (last visited December 16, 2014). The standards indicate further that, to be allowable, costs subject thereto must be, inter alia, "reasonable for the performance of the [contract]," as defined therein, in conformance with identified limitations and exclusions and "[b]e adequately documented . . . by invoices, cancelled checks, wire transfers, or other forms of documentation evidencing a disbursement and substantiating that a cost was incurred by the organization during the period of the [contract]." Id., p. 8. In short, because these cost standards and the accompanying documentation requirements apparently are widely used in state contracts for health and human services, their presence in the defendants' contract does not weigh in favor of a finding that they are an arm of the state due to especially close budgetary monitoring.

[19] Again, there is no operations contract in evidence. The department's request for proposals, for its part, set only general parameters for the operation of the nursing home and invited "innovative submissions" from bidders.

[20] When legislation authorizes a state entity either to perform a service itself or to contract for its performance by a private party, and the state chooses the latter option, courts should acknowledge the statutory distinction and conclude that the choice to contract for services weighs against a determination that the private party is an arm of the state. See, e.g., *Rosario* v. *American Corrective Counseling Services, Inc.*, 506 F.3d 1039, 1041, 1044–45 (11th Cir. 2007). In the present matter, the trial court made a

contrary observation, namely, that "[t]he state's statutory option to provide [nursing home] services directly rather than contract for them supports the notion that a private entity providing those services is working as an arm of the state."

[21] The defendants, for their part, appear to have understood and accepted the state's expectations. In its response to the request for proposals, iCare represented that it was "considering the purchase of a presently vacant and appropriately zoned" nursing home facility for the project. It indicated further that the proposed facility would provide "a substantial real estate tax base for the local municipality" in which the facility was located. Additionally, the defendants' counsel contacted the plaintiff to attempt to verify that the property already was properly zoned.

[22] Almost all of the federal Circuit Courts of Appeals "have denied state sovereign immunity to private entities, more or less categorically." *Del Campo* v. *Kennedy*, supra, 517 F.3d 1079.

[23] Because we agree with the plaintiff's claim that the trial court's preemption analysis was faulty, we need not address its alternative arguments that the analysis constituted dicta or that the court improperly decided the preemption issue in the context of a motion to dismiss.

[24] Again, the evidence presented in the present case demonstrated that the department fully expected the defendants to comply with the zoning regulations. This provides further support for our conclusion that those regulations are not preempted by § 17b-372a. See *Helicopter Associates, Inc.* v. *Stamford*, 201 Conn. 700, 710–11, 519 A.2d 49 (1986) (relying, in part, on agency officials' actions and statements evidencing intent that licensee comply with zoning regulations to conclude that statutes, pursuant to which license was granted, did not preempt zoning regulations).